CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
September 16, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ M. Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **ABDULLAH BADIE,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:25-cv-00339** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **S. FRANKLIN, et al.,** | ) | **Senior United States District Judge** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Abdullah Badie,[1] a state inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against multiple individuals employed at Red Onion State Prison (Red Onion). The case is presently before the court on a motion for summary judgment filed by defendants A. Shepherd and E. Creech.[2] ECF No. 45. Badie has not responded to the motion, and the time for doing so has expired. For the reasons set forth below, the motion for summary judgment is **GRANTED**.

## I. Background

### A. Badie's Verified Complaint

Badie's claims against Shepherd and Creech stem from his placement on a Self-Management Housing Plan (SMHP) at Red Onion from July 28, 2023, to September 5, 2023. Several days earlier, on July 22, 2023, correctional officers allegedly used excessive force against Badie, prompting him to report that he was having suicidal thoughts so that he could be housed in the medical unit. Compl., ECF No. 1, at 9.

[1] Badie is also known as Brandon Crosby.

[2] The defendants' last names are spelled incorrectly in the complaint.

Badie alleges that he told Shepherd, a mental health clinician, "that he was only on suicide watch because that was the only way he felt safe from being battered by staff." Id. When Badie saw Shepherd again on July 28, 2023, he once again indicated that he was going "on and off suicide watch" because "he only felt safe in medical." Badie alleges that Shepherd informed him that he was "abusing being on 'safety status' and needed to 'manage' his behavior." Id. Consequently, Shepherd and other officials placed Badie on an SMHP, which Badie describes as "modified strip cell" status. Id. Badie asserts that he received no form of hearing prior to the decision. Id. at 11.

After being placed on the SMHP, Badie was moved to a mental health cell where he received only a safety smock and a mat. Id. Badie remained on the SMHP from July 28, 2023, until September 5, 2023. Id. During that period, he was not permitted to receive four hours of recreation time, and he did not have access to a phone or the electronic kiosk. Id. Although he was allowed to shower, he could not wear shower shoes or possess his own hygiene products. Id. at 11–12. Instead, he "had to ask for soap and toilet paper when the officers came around every 30 minutes." Id. at 12. He was also restricted from possessing books, religious items, pens, and eating utensils. Id. If Badie had not been placed on the SMHP, "he would have received 4 [hours] of recreation a day, access to the kiosk to email his family or see pictures of them, video visits, phone time, religious services and more activities . . . ." Id.

Badie alleges that he only saw "mental health" four to five times. Id. He further alleges that he did not receive a "mental health evaluation" or "any adequate medical treatment/assessment." Id.

Based on these and other allegations, Badie filed this action under 42 U.S.C. § 1983. He asserts, among other claims, that Shepherd and Creech, "the head supervisor for the mental

health department," violated his rights under the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment. Id. at 6, 12.

**B. Defendants' Evidence**

In support of their motion for summary judgment, Shepherd and Creech submitted a declaration executed by Shepherd, along with relevant medical and mental health records and Virginia Department of Corrections (VDOC) policies. See ECF No. 46-1.[3] According to the defendants' evidence, Shepherd is a mental health clinician and psychology associate who provides mental health services to inmates at Red Onion. Shepherd Decl., ECF No. 46-1, ¶ 1. On July 21, 2023, Shepherd saw Badie while performing weekly rounds in the restorative housing unit (RHU), an area "operated under maximum security regulations and procedures" that is utilized "for inmates needing confinement for their own protection, when there is a need to prevent imminent threat of physical harm to the inmate or another person or the inmate's behavior threatens the orderly operation of the facility." Id. ¶¶ 6, 21; see also VDOC Operating Procedure 841.1 at 4, Shepherd Decl. Ex. B, ECF No. 46-1. Shepherd documented observing no signs of suicidal ideation, depression, or other mental health symptoms, but noted that a complete assessment could not be performed due to Badie engaging in verbally aggressive behavior. ECF No. 46-1 at 22. Shepherd also noted that Badie would be monitored according to policy and that he did not have any mental health needs that required further treatment at that time. Id.

[3] The medical and mental health records are attached to Shepherd's declaration as Exhibit A. The court will cite to the records using the docket and page numbers assigned by the court's CM/ECF system.

On July 22, 2023, another provider completed an at-risk inmate notification form indicating that Badie met the criteria for being at risk for deterioration, self-harm, or a danger to others. ECF. No. 46-1 at 23. Badie was permitted to remain in the RHU, and new precautions were added for him, including fifteen-minute watches, placement in a mental health cell with restrictions, a metal restriction, and a safety diet. Id. Badie could have toilet paper as needed, but he was not allowed to possess a towel, toothbrush, deodorant, soap, washcloth, toothpaste, or razor. Id. The form also indicated that Badie should be searched once per shift for contraband. Id.

On July 25, 2023, Shepherd attempted to speak to Badie due to him being on mental health precautions. Shepherd Decl. ¶ 23. Shepherd noted that a full assessment could not be completed as a result of Badie refusing to speak to the clinician. ECF No. 46-1 at 24. Shepherd also noted that Badie would continue to be monitored. Id.

Shepherd saw Badie again on July 26, 2023. Shepherd Decl. ¶ 24. Shepherd noted that no clinically significant symptoms of thought or mood disorder or other signs of mental disorder were observed at that time. ECF No. 46-1 at 25. He also noted that Badie denied suicidal ideation, homicidal ideation, or thoughts of self-directed violence (SDV); that he "presented as calm with no observable mental health symptoms"; and that he was "oriented to all spheres." Id. Based on the assessment, Shepherd determined that Badie could be released from mental health precautions and monitored according to policy. Id.

That same day, Shepherd completed an at-risk inmate notification form indicating that Badie had been screened for an RHU assignment and that he currently met the criteria for being at risk for deterioration, self-harm, and/or a danger to others. Id. at 26. However,

Shepherd noted that Badie was being released from mental health precautions and that the additional restrictions previously imposed could be discontinued. Id.

On July 27, 2023, Shepherd saw Badie again at Badie's request. Shepherd Decl. ¶ 26. Although Badie voiced suicidal and homicidal thoughts, Shepherd noted that Badie "presented as agitated with no observable mental health symptoms." ECF No. 46-1 at 27. Shepherd also indicated that crisis management was needed and that Badie would be placed on mental health precautions and monitored per policy. Id.

Following the assessment, Shepherd completed an at-risk inmate notification form that reimposed precautions and interventions, including fifteen-minute watches, placement in a mental health cell with restrictions and camera observations, a metal restriction, and a safety diet. Id. at 28. Pursuant to the form, Badie was allowed to have a mattress, safety blanket, towel, washcloth, toilet paper, and soap, but he was not permitted to possess a pillow, sheet, pillow case, toothbrush, razor, or pen. Id. He was limited to wearing a safety smock, and he was allowed to shower and possess screened mail. Id. The form also indicated that Badie should be searched once per shift for metal, razors, rigid items, or pens, and that mental health should be contacted if his behavior changed. Id.

Shepherd completed another at-risk inmate notification form on July 28, 2023, which released Badie from the precautions and interventions imposed the previous day Id. at 29. Shepherd also permitted discontinuation of the fifteen-minute watch requirement and the modified strip cell (MSC), clinical protective diet (CPD), and "metal/razor/rigid/pen restrictions." Id.; Shepherd Decl. ¶ 28. Shepherd noted that mental health should be contacted if Badie's behavior changed. Id.

That same day, Shepherd conducted a mental health assessment. Shepherd Decl. ¶ 29. Shepherd noted that Badie indicated that he would not return to the main building upon being informed that he was being released from precautions. ECF No. 46-1 at 30. Shepherd also noted that Badie "stated that he had intentions of harming himself and was experiencing suicidal ideation, and wanted it documented on camera." Id. Aside from appearing agitated, Badie presented with "no other observable mental health limitation" and appeared to be "oriented in all spheres." Id. Shepherd reported that Badie had "made statements to Mental Health staff and other inmates that he would use Mental Health Precautions as a way to stay in Medical." Id. Shepherd determined that Badie should be "released from Mental Health Precautions, . . . placed on a Self-Management Housing Plan," and "monitored according to policy." Id. at 30–31.

Shepherd also conducted a maladaptive behavior screening on July 28, 2023. Id. at 32. The associated report lists Creech as the referring provider. Id. Based on Badie's scores in various areas, including threatening and assaultive behavior directed toward others and compliance with programming, Shepherd and Creech determined that a self-management housing plan was appropriate. Id.; see also Shepherd Decl. ¶ 33. "A self-management housing plan (SMHP) is intended to provide enhanced protocol for inmates who are displaying acting out behavior that is compromising their daily functioning and significantly interfering with the orderly operation of the institution on a repetitive basis, but the behaviors are not considered to be the result of severe mental illness." Id. ¶ 4. An SMHP is typically used for an inmate who is currently assigned to an RHU. Id. ¶ 6.

After the maladaptive behavior screening, Badie was initiated on an SMHP that was originally set to expire on August 28, 2023. Shepherd Decl. ¶ 34; see also ECF No. 46-1 at 33.

During the time period at issue, "prison administration required that all inmates placed on SMHP also be placed on safety status initially," which included wearing only a safety smock and removing all personal property from the inmate's cell. Shepherd Decl. ¶ 34. It also resulted in reduced access to recreation since the inmate was required to remain in his cell. Id. Inmates on safety status gradually received more privileges as safety permitted. Id.

Pursuant to the initial SMHP initiated on July 28, 2023, Badie was placed in a mental health cell with restrictions, including a metal restriction and a safety diet. Shepherd Decl. ¶ 35. The SMHP noted that Badie would not be given any type of utensil or plastic food tray to prevent such item from being used for self-harm. ECF No. 46-1 at 33. The only authorized bedding consisted of a mattress and safety blanket, and Badie was limited to wearing a safety smock. Id. The SMHP allowed Badie to have a safety pen to sign legal documents, and he could also possess screened mail with any staples removed. Id. Although Badie was not permitted to possess personal hygiene items in his cell, he was authorized to use a towel and washcloth, a toothbrush and toothpaste, soap, and toilet paper. Id. at 34. He did not have access to a razor or deodorant. Id.; see also Shepherd Decl. ¶ 40.

The SMHP also provided for increased cell searches. ECF No. 46-1 at 34. It required that Badie's cell be searched for contraband each time he returned to his cell. Id. It also required that the cell be searched for contraband at unannounced times at least twice per week. Id. Shepherd approved the SMHP in his capacity as psychology associate, and the plan noted that any changes would be "made as a collaborative effort between the Mental Health Clinician and the Unit Manager." Id.

On or about July 31, 2023, Badie began refusing his meals. Shepherd Decl. ¶ 44. On August 2, 2023, Badie refused to participate in a hunger strike assessment. Id. ¶ 45. Shepherd

subsequently conducted the assessment on August 3, 2023. Id. ¶ 46. When asked why he was participating in a hunger strike, Badie reported that he did not trust anyone and that everyone was "trying to kill [him]." ECF No. 46-1 at 37. He also reported that he wanted to be safe and that he was hoping to gain the attention of someone outside the prison. Id.

A psychiatry progress note indicates that Dr. E. McDuffie saw Badie at approximately 11:00 a.m. on August 3, 2023, at which time Badie reported that he was engaging in a hunger strike to protest being roughly handled, restrained, and moved by security. Id. at 38. He alleged that he had been punched in the face while handcuffed and that he wanted to be housed and recorded on camera in the medical department so that officers could not kill him. Id. at 39. The psychiatrist's assessment included diagnoses of post-traumatic stress disorder (PTSD) and antisocial personality disorder (ASPD). Id. at 38. The psychiatrist noted that Badie had been prescribed Cymbalta and Benadryl and that he had the capacity to make his own medical decisions. Id. at 38–39.

On August 4, 2023, Shepherd met with Creech and other members of a hunger strike management committee. Shepherd Decl. ¶ 48. Based on prior incidents, Badie "was believed to be engaging in a hunger strike in order to manipulate his situation so that he would be moved to medical," and there was no indication that he would end the hunger strike without further intervention. Id. ¶ 49; see also ECF No. 46-1 at 44–46. Consequently, Badie was placed on hunger strike protocol, which included placement in a dry cell, and he was offered several incentives to resume consumption of meals, including the receipt of personal property. Shepherd Decl. ¶¶ 50–51.

That same day, Shepherd saw Badie in connection with the existing SMHP, and Badie inquired as to whether he would be receiving his property back. ECF No. 46-1 at 42. Shepherd

noted that Badie denied having suicidal ideation, homicidal ideation, or thoughts of self-harm; that he "presented as calm with no observable mental health symptoms"; and that he appeared to be "oriented to all spheres." Id. Based on his improved behavior, Shepherd found it appropriate to provide him with a t-shirt, boxers, shower shoes, and scrubs. Id. Shepherd noted that the SMHP would be updated accordingly and that Badie would continue to be monitored according to policy. Id.

On August 5, 2023, a correctional officer advised another mental health clinician that Badie had accepted and consumed his lunch and dinner meals that day. Id. at 47. The clinician noted that Badie would be considered for release from the hunger strike protocol if he consumed his breakfast meal the following morning. Id. Badie subsequently accepted and consumed his breakfast meal on August 6, 2023, and paperwork was prepared for him to be released from the hunger strike protocol. Id. at 48. Defendant Creech participated in approving the decision. Id. at 49.

On August 8, 2023, Shepherd saw Badie again as part of the SMHP and at the request of security after Badie reported that he would not leave the pod shower until he spoke to mental health staff. Id. at 50. Shepherd noted that Badie "presented as irritable with no other observable mental health symptoms" and that he expressed disagreement with being placed on the SMHP. Id. Shepherd also noted that Badie remained defiant and resistant to changing disruptive behaviors that necessitated the implementation of the SMHP and that Badie would continue to be monitored according to policy. Id.

Shepherd returned for another mental health assessment on August 15, 2023. Id. at 53. Shepherd noted that Badie continued to express the belief that the SMHP was unjustified but that he had "not displayed any disruptive behavior since the last meeting" on August 8, 2023.

Id. Additionally, Badie denied experiencing thoughts of self-harm or homicidal ideation and presented as calm with no observable mental health symptoms. Id. Shepherd noted that Badie would continue to be monitored per policy and that the SMHP would be updated accordingly. Id.

On August 16, 2023, Badie's SMHP was reviewed by Shepherd and other officials. Shepherd Decl. ¶ 60. Although Badie was still placed in a mental health cell with restrictions, including a metal restriction and a safety diet, he was permitted to have a standard blanket, sheet, and pillow, in addition to a mattress. See ECF No. 46-1 at 54. He also regained access to personal books, deodorant, and a razor. Id. at 54–55.

Shepherd saw Badie on August 25, 2023, as part of Badie's SMHP. Shepherd noted that Badie possessed items that were determined to be contraband and that Badie argued that he was allowed to possess the items found in his possession. Id. at 58. Shepherd also noted that Badie was belligerent toward security staff, a unit manager, and Shepherd. Id. Badie was described as being "very agitated but with no other observable mental health symptoms." Id. Shepherd noted that the SMHP would be extended by one week due to Badie being in possession of contraband materials. Id.

Shepherd saw Badie again on September 1, 2023. Id. ¶ 67. During the encounter, Badie "presented as calm with no mental health symptoms," and he denied experiencing suicidal ideation, homicidal ideation, anxiety, depression, or other mental health issues. ECF No. 46-1 at 63. Badie requested to see a psychiatrist, and Shepherd noted that he would be scheduled for an appointment. Id. Badie saw the psychiatrist less than two weeks later. Id. at 66.

On September 5, 2023, Badie was released from SMHP status. Shepherd Decl. ¶ 68. Creech and other officials signed the release paperwork. Id.; see also ECF No. 46-1 at 65.

While housed on SMHP status, Badie was continuously prescribed duloxetine (Cymbalta) and diphenhydramine (Benadryl) for mental health issues, but he often refused to take the medications. Shepherd Decl. ¶¶ 69 –70; see also ECF No. 46-1 at 69, 73–86. During that period of approximately 40 days, "he was seen by a psychiatrist once and was evaluated in person six times by mental health clinicians," including Shepherd. Shepherd Decl. ¶ 17. He was also seen by medical staff at least six times. Id.; see also ECF No. 46-1 at 35 (treatment note reflecting that Badie received Advil for a headache); id. at 52 (treatment note reflecting that Badie was seen for complaints of groin pain); id. at 56 (treatment notes reflecting that Badie underwent an EKG after complaining of chest pain and that he was examined again after complaining of prostate pain, anal pain, a headache, and other issues); id. at 60 (treatment notes documenting an evaluation for complaints of lower pelvic pain and constipation and a subsequent colonoscopy consult); id. at 62 (sick call form documenting complaints of congestion and sinus issues).

## II. Standard of Review

Shepherd and Creech have moved for summary judgment on the merits of the claims asserted against them. Under Rule 56 of the Federal Rules of Civil Procedure, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)).

When ruling on a motion for summary judgment, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Id. at 312. The court may not "weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). "To survive summary judgment, 'there must be evidence on which the jury could reasonably find for the nonmovant.'" Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

"As a general rule, when one party files a motion for summary judgment, the nonmovant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "However, it is well-established that a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) (internal quotation marks omitted); see Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Nonetheless, conclusory allegations are insufficient to survive summary judgment. See Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

## III. Discussion

### A. Claim for Denial of Due Process

Badie first asserts a claim for denial of due process stemming from his placement on the SMHP. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To establish that a government actor violated this proscription, 'a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law.'" Cartagena v. Lovell, 103 F.4th 171, 182 (4th Cir. 2024) (quoting Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015)). In the absence of a protected interest, "a prisoner cannot invoke the procedural protections of the Due Process Clause." Prieto, 780 F.3d at 248 (internal quotation marks omitted).

A protected liberty interest may arise from the Constitution itself or through state laws or policies. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). However, because the Supreme Court has already held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," id. (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)), the court must determine whether state law provides such an interest in the context of this case.

To establish a liberty interest derived from state law, an inmate in Virginia must "point to a Virginia law or policy providing him with an expectation of avoiding the conditions of confinement and demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." Prieto, 780 F.3d at 252. In deciding whether the conditions of confinement to which an inmate were transferred were "harsh and atypical," courts consider: (1) the magnitude of the confinement restrictions; (2) whether the restrictions were

for an indefinite period; and (3) whether the assignment to restrictive confinement had any collateral consequences on the inmate's sentence. Cartagena, 103 F.4th at 183.

Here, Badie has not pointed to a state statute, regulation, or policy that provided him with an expectation of avoiding the conditions of his confinement to which he was subject on the SMHP. Even if the court were to assume that such law or policy exists, Badie has not adequately alleged, much less shown, that his conditions of confinement were harsh and atypical in relation to the ordinary incidents of prison life.

The only applicable factor that possibly weighs in Badie's favor is the first factor, relating to the magnitude of confinement conditions. The record indicates that his initial placement on the SMHP required the removal of all clothing with the exception of a safety smock, the removal of all personal property and hygiene items, reduced access to recreation and bedding, dietary restrictions, and increased cell searches. Badie also alleges that he was not allowed to use the phone or kiosk to contact family or friends and that he did not have access to video visits or religious services. See, e.g., Cartagena, 103 F.4th at 183 (finding that the first factor "might . . .be satisfied" where the plaintiff alleged that he was "locked down in a cell 21 hours a day, that recreation took place in a cage, . . . that contact with the outside world and other inmates was limited," and that "he was subject to strip searches when he left his cell") (emphasis added).

Even if the first factor weighs in Badie's favor, however, "the severity of the conditions alone are insufficient to create a liberty interest." Smith v. Collins, 964 F.3d 266, 277 (4th Cir. 2020). Instead, the court must consider the indefiniteness of the conditions, as well as their duration, in determining whether prisoners have a sufficient liberty interest in avoiding such conditions of confinement. Id. These additional considerations plainly weigh against finding a

liberty interest in this case. Badie's placement on the SMHP lasted approximately 40 days, and the initial restrictions could be (and were) relaxed with improved behavior. Thus, Badie's placement on the SMHP was not indefinite, and the overall period of time in which he was subject to more restrictive conditions was far briefer than the duration that courts have found to implicate a protected liberty interest. Compare id. at 279 (concluding that "four-plus years in solitary confinement" was "significant enough to tip the indefiniteness factor in Smith's favor"), and Incumaa v. Stirling, 791 F.3d 517, 531 (4th Cir. 2015) (addressing "an exceptional 20-year stint in highly restrictive solitary confinement"), with Cartagena, 103 F.4th at 183–84 (affirming the dismissal of a due process claim premised on an 18-month term of confinement in a restrictive treatment program where the inmate acknowledged that the conditions of his confinement could be relaxed as time passed), and Kimble v. Swink, No. 22-6437, 2024 WL 688105, at *6 (4th Cir. Feb. 20, 2024) (affirming the dismissal of a due process claim where an inmate was confined in segregation "only 398 days," during which time "he was held in his cell for 22 hours per day" and the inmate was subject to even greater recreation and contact restrictions during the first 138 days).

Finally, as to the third factor, there is no allegation or evidence that Badie's SMHP placement had any collateral consequences on his sentence. See Smith, 964 F.3d at 279–80 (noting that such consequences may take the form of parole ineligibility or an "inability to earn good-time credits as a collateral consequence" of an inmate's segregation status).

For these reasons, the court concludes that Badie has failed to establish that his placement on the SMHP for approximately 40 days implicated a protected liberty interest. Accordingly, the motion for summary judgment filed by Shepherd and Creech will be granted

with respect to the claim for denial of procedural due process in violation of the Fourteenth Amendment.

**B. Eighth Amendment Claims**

Badie also claims that Shepherd and Creech violated his rights under the Eighth Amendment. He appears to allege that his conditions of confinement while subject to the SMHP were cruel and unusual and that these defendants failed to provide adequate mental health treatment.

"Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). Prison officials also have a duty to provide "humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). A constitutional violation occurs "when a prison official demonstrates deliberate indifference to an inmate's serious medical needs," DePaola, 884 F.3d at 486, or to "conditions posing a substantial risk of serious harm," Farmer, 511 U.S. at 834.

To establish an Eighth Amendment claim of deliberate indifference, an inmate must satisfy two elements. "First, the deprivation alleged must be, objectively, sufficiently serious." Id. Second, the inmate must show that the prison official acted with a "sufficiently culpable state of mind," specifically, "deliberate indifference" to the inmate's health or safety. Id. Deliberate indifference is a "very high standard," Ford v. Hooks, 108 F.4th 224, 229 (4th Cir. 2024) (internal quotation marks omitted), that is equivalent to "criminal recklessness," Cartagena, 103 F.4th at 181. It "requires proof that the prison official subjectively 'knew of and disregarded an excessive risk to inmate health or safety.'" Id. (brackets omitted) (quoting Farmer, 511 U.S. at 837). "Thus, to show that a prison official was deliberately indifferent, the prisoner must show that the official 'consciously disregarded a substantial risk of serious

harm.'" Cartagena, 103 F.4th at 181 (brackets omitted) (quoting Farmer, 511 U.S. at 839); see also Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.").

Applying these principles, the court concludes that Shepherd and Creech are entitled to summary judgment on the Eighth Amendment claims asserted against them. The record reflects that Badie was placed on the SMHP after he made statements suggesting that he was suicidal in an effort to avoid being moved back to the main correctional building. See Compl. at 10 (acknowledging that Badie went "on and off suicide watch" because he wanted to remain in the medical unit following the alleged altercation with correctional officers); Shepherd Decl. ¶ 17 (averring that Badie was temporarily placed on SMHP status after he made statements expressing "his intent to abuse the mental health precaution system"). While Badie was subject to more restrictive conditions of confinement as a result of his SMHP status, some of which were lifted following periodic status reviews, the duration of his confinement in what he refers to as a "modified strip cell" pales in comparison to the prolonged or indefinite terms of restrictive confinement described in other cases in which the subjective element of deliberate indifference has been found to be satisfied. See Thorpe v. Clarke, 37 F.4th 926, 931, 941 (4th Cir. 2022) (concluding that prisoners "living in long-term solitary confinement" at Virginia's two supermax facilities—"some as long as 24 years"—"adequately pleaded both that they suffered extreme injuries and that Defendants were aware of them"); Porter v. Clarke, 923 F.3d 348, 357, 364 (4th Cir. 2019) (concluding that the undisputed evidence established both that the challenged conditions of confinement on Virginia's death row—"under which

Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small cell with no access to congregate religious, educational, or social programing"—"created a substantial risk of serious psychological and emotional harm and that State Defendants were deliberately indifferent to that risk").

Additionally, Badie has not put forth any other evidence that would allow a reasonable jury to find that Shepherd or Creech consciously disregarded a substantial risk of serious harm. His institutional records indicate that he was regularly assessed by mental health professionals and medical staff while placed on the SMHP. In addition to the administrative reviews associated with the SMHP and the hunger strike protocol, Badie was evaluated in person six times by mental health clinicians, including Shepherd, and he was seen by the prison psychiatrist, Dr. McDuffie. He was also seen by medical staff at least six times during the five-week period in which he was placed on the SMHP, and he continued to have access to medications prescribed for mental health issues. On this record, no reasonably jury could find that Shepherd or Creech acted with deliberate indifference. While Badie may disagree with the mental health treatment provided, such disagreement falls short of showing deliberate indifference on the part of the defendants. Jackson, 775 F.3d at 178; see also Cartagena, 103 F.4th at 182 ("The defendants responded to Cartagena's conditions and sought to address them with treatment while, at the same time, imposing restraint to protect the prison population. The fact that Cartagena did not agree with the treatment can hardly be attributed to a criminal recklessness on the part of prison officials."); Powell v. Washington, 720 F. App'x 220, 229 (6th Cir. 2017) ("The complaint indicates no more than Powell's disagreement with the conclusion of his institution's mental-health staff that his needs could be adequately addressed in administrative segregation, and it therefore fails to state a deliberate-indifference

claim."). Accordingly, Shepherd and Creech are also entitled to summary judgment on the Eighth Amendment claims.

## IV. Conclusion

For the reasons stated, the motion for summary judgment filed by Shepherd and Creech, ECF No. 45. is **GRANTED**. An appropriate order will be entered.

Entered: September 16, 2026

Michael F. Urbanski
U.S. District Judge
2026.09.16
11:03:20 -04'00'

Michael F. Urbanski
Senior United States District Judge